**MICHELE WEIN LAYNE**
**REGIONAL DIRECTOR**
**Katharine E. Zoladz**
**Amy Jane Longo**
**Robert Conrrad**
**Douglas M. Miller**
**Alec Johnson**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
444 S. Flower Street, Suite 900
Los Angeles, California 90071
323-965-3998 (Miller)
millerdou@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>　　　　　　　　　　Plaintiff,<br><br>　　　-against-<br><br>**BRADLEY C. DAVIS,**<br><br>　　　　　　　　　　Defendant. | **COMPLAINT**<br><br>20 Civ. \_\_\_\_\_ (　　)<br><br>**JURY TRIAL DEMANDED** |

　　　　Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant Bradley C. Davis ("Defendant"), alleges as follows:

### SUMMARY

　　　　1.　　This case involves insider trading by Davis in the securities of Nordson Corporation ("Nordson") between January 2016 and August 2016. At the time, Defendant worked at Nordson as the vice president of its Asia Pacific Group in Shanghai, China and had regular access to material non-public information ("MNPI"), including the confidential financial reporting of Nordson's largest business division. In early 2016, the MNPI Defendant received showed that this business division was outperforming internal forecasts and that its orders and shipments were up sharply

from the same time the year before. This outperformance continued through the first three quarters of 2016, and in each of those quarters, shortly before Nordson released its earnings statements to the public, Defendant purchased over $1 million worth of Nordson securities using his savings and his entire 401(k).

2. Nordson's earnings exceeded its stated guidance and market expectations in each of these quarters. In reaction to Nordson's earnings announcements for these quarters, the company's stock price went up significantly, sometimes as much as 14% in a single day, rising by over 40% from January through August 2016. Defendant took advantage of each of these increases in stock price by quickly selling off all of the Nordson securities he had purchased in that quarter – most in less than a week – and reaping the profits. In total, Defendant netted profits over $850,000 through his buying and selling of Nordson securities during the first three quarters of 2016, nearly doubling the size of his savings in less than a year.

3. Defendant knew or was reckless in not knowing that he was prohibited from trading on the basis of the MNPI he received through his position at Nordson. Defendant had received training on Nordson's Code of Ethics, which expressly prohibited insider trading, and knew that he was prohibited from trading on the basis of information that would be considered important to a reasonable investor. In fact, Defendant had spearheaded translating Nordson's insider trading policy into Chinese to help ensure that other employees of the company understood the policy. The general counsel of Nordson had also told Defendant personally that he could not trade in Nordson securities if he was aware of any significant business information about the company at the time of his trading.

4. When the Commission staff questioned Defendant about his trading in Nordson securities in 2017, he provided misleading answers and tried to cover up the reasons for his trading. For example, in 2016, Defendant purchased over $100,000 in Nordson option contracts. This was

the first time Defendant had ever traded option contracts, and he did so after his broker had warned him that trading Nordson options was very difficult and risky. Defendant ignored all of these warnings and went forward with the trades, telling his broker that he believed analysts' expectations about Nordson were too conservative and that earnings were going to be better than what the market expected.

5. However, when the Commission staff contacted Defendant in June 2019 and asked him about the reasons for his options trading, he insisted that he was just "trying out" options contracts and only selected Nordson because it was a stable company. Defendant also claimed that his trading was not intended to coincide with the release of Nordson's earnings statements. None of these statements were true.

6. Defendant did not select Nordson options to try out options trading with a stable company. To the contrary, Defendant's broker had specifically warned him that trading Nordson options was very difficult and risky. Defendant's claim that his options trading was not intended to coincide with the release of Nordson's earnings was also false. Defendant made it clear to his broker that his entire investment strategy was to buy Nordson options in advance of the earning statements because he believed earnings were going to be better than what was expected in the market.

## VIOLATIONS

7. By virtue of the foregoing conduct and as alleged further herein, Defendant has violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

8. Unless Defendant is restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

9. The Commission brings this action pursuant to the authority conferred upon it by Exchange Act Section 21A(a) [15 U.S.C. § 78u-1(a)].

10. The Commission seeks a final judgment: (a) permanently enjoining Defendant from violating the federal securities laws and rules this Complaint alleges he has violated; (b) ordering Defendant to disgorge all ill-gotten gains he received as a result of the violations alleged here and to pay prejudgment interest thereon; (c) ordering Defendant to pay civil money penalties pursuant to Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3); and (d) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to Exchange Act Section 27 [15 U.S.C. § 78aa].

12. Defendant, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

13. Venue lies in this District under Exchange Act Section 27 [15 U.S.C. § 78aa] because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. During the time of the conduct at issue, shares of Nordson stock were traded on the NASDAQ Stock Exchange ("NASDAQ"), which is headquartered in New York, New York.

## DEFENDANT

14. **Bradley C. Davis** is 63 years old and currently resides in Taiwan. Davis is a United States citizen and worked for Nordson for twenty-eight years, starting in approximately September 1989 and retiring in 2017. Davis spent his entire career at Nordson working in China, where he was

4

the vice president of Nordson's Asia Pacific Group and based in Shanghai. Davis's position made him part of Nordson's senior leadership.

## OTHER RELEVANT ENTITY

15. **Nordson Corporation** is an Ohio corporation, headquartered in Westlake, Ohio, and is a multinational corporation that designs and manufactures dispensing equipment for consumer and industrial adhesives, sealants, and coatings. Nordson's stock is registered with the Commission and is traded on the NASDAQ under the symbol "NDSN."

## FACTS

I. BACKGROUND

A. **Defendant Regularly Received MNPI**

16. In January 2016, Defendant served as the vice president of Nordson's Asia Pacific Group and was the most senior member of Nordson management stationed in China.

17. As vice president of the Asia Pacific Group, Defendant was responsible for sales, marketing, and operations for the company's Adhesives Dispensing Systems ("ADS") segment in Asia. ADS was the largest of Nordson's three business segments, representing approximately half of Nordson's revenues in 2015 and 2016.

18. In his role as vice president of the Asia Pacific Group, Defendant was responsible for ADS financial reporting in Asia.

19. Defendant regularly had access to MNPI related to ADS's operations worldwide. The financial reporting Defendant received detailed, among other things, the global performance of the "Core Adhesives" division, which represented approximately 70% of ADS's sales and approximately 35% of Nordson's overall sales in early 2016.

20. Two of the financial reports Defendant received detailing the financial performance

5

of Core Adhesives were a biweekly revenue analysis and a weekly backlog report. Neither of these reports was available to the public. Nordson stored these reports on its secure servers and restricted which employees had access to them.

21. The biweekly revenue reports constituted MNPI because they included current revenues for Core Adhesives against internal quarterly forecasts and showed whether the division was ahead or behind its internal revenue target for the quarter. At the end of the quarter, these biweekly revenue reports would not only report revenues for Core Adhesives but also would reflect the extent to which the division had surpassed internal forecasts for the quarter.

22. The weekly backlog reports constituted MNPI because they compared worldwide order rates for Core Adhesives against the same 12-week period in the prior year, as well as shipment rates against the prior year. At the end of a quarter, these weekly backlog reports would show the percentage change in orders and shipments for Core Adhesives against the same quarter in the prior year.

   **B.**  **Nordson Prohibited Trading on the Basis of MNPI**

23. During Defendant's employment, Nordson had a Code of Ethics that prohibited employees of the company from trading Nordson stock on the basis of MNPI and what the Code referred to as "insider trading." The Code was revised several times during Defendant's employment.

24. The 2003 edition of the Code of Ethics defined "material" information as information about a company that would be considered important by a reasonable investor in determining whether to buy, sell or hold that company's securities. It further explained that information was "non-public" if it had not been disclosed publicly through a press release, earnings release or a Form 8-K filing with the Commission, and warned employees that they must not use MNPI to make decisions about buying or selling stock for financial gain. Moreover, it

6

recommended that if an employee was considering buying or selling a stock because of inside information they possessed, they should assume that such information was material.

25. Over the course of his employment, Defendant knew and understood Nordson's policy against insider trading.

26. Defendant had received a copy of Nordson's 2003 Code of Ethics and spearheaded having it translated into Chinese.

27. Defendant supervised other employees at Nordson and was responsible for training others at Nordson on its Code of Ethics.

28. In February 2008, the general counsel for Nordson personally instructed Defendant that if he wanted to trade Nordson securities in advance of an earnings announcement, Defendant should first confirm via email that he was not aware of any significant business information about Nordson. The general counsel cautioned Defendant that significant business information could come from a review of documents or from discussions with other Nordson personnel who may have had access to such information. The general counsel further stated that before trading, Defendant should confirm in writing that he did not have significant business information both for his own protection and for the protection of the company. The general counsel repeated this instruction to Defendant in February 2010.

29. The 2012 edition of Nordson's Code of Ethics also prohibited employees from trading Nordson stock on the basis of "material" information and what the Code referred to as "insider trading." It explained that MNPI was not restricted to a specific group of employees within the company and that any employee, during "the normal course" of their work at Nordson, may come into possession of MNPI about the company, and they must not use that information to make decisions about buying or selling stock for financial gain, which would be considered insider trading.

30. Defendant knew and understood Nordson's 2012 policy on insider trading because

he had received a copy of the 2012 edition of Nordson's Code of Ethics and had successfully completed training on it.

31. Defendant also trained others on the 2012 edition of Nordson's Code of Ethics.

32. The 2016 edition of Nordson's Code of Ethics was identical to the 2012 edition of the Code of Ethics with respect to its prohibition on insider trading.

## II. DEFENDANT'S INSIDER TRADING SCHEME

### A. Defendant Breached His Fiduciary Duty to Nordson and Traded on the Basis of MNPI

33. Between January and August 2016, in each of the first three quarters of 2016, Defendant engaged in insider trading. He purchased over $1 million worth of Nordson securities in each quarter while knowingly in possession of MNPI, which he came into possession of during the course of his employment at Nordson, including the biweekly revenue reports and weekly backlog reports. These reports showed Core Adhesives was outperforming internal forecasts and that its orders and shipments were up sharply from the same time the year before.

34. Defendant purchased the securities shortly before Nordson released its earnings announcements in these quarters and shortly before the public learned that Nordson's earnings had exceeded its stated guidance and market expectations. Defendant timed the purchase of the securities so that he could take advantage of an increase in Nordson's stock price after it announced its earnings. When the stock prices went up, sometimes by as much as 14% in a single day, Defendant sold all of the Nordson securities he had purchased using MNPI in that quarter and reaped all the profits.

35. In total, Defendant reaped illegal profits of over $850,000 from his trading in Nordson securities on the basis of MNPI during the first three quarters of 2016.

### B. Defendant Learned MNPI in the First Quarter of 2016

36. The first fiscal quarter for Nordson in 2016 was scheduled to close on January 31,

8

2016. In early January 2016, Nordson's stock was trading at around $55 a share, putting it at a three-year low and down 20% from a year earlier.

37. In 2015, Nordson posted only 3% sales growth and had either missed or reached the low-end of its guidance estimates in each of the last three quarters of 2015.

38. Nordson publicly projected that its sales growth for the first quarter of 2016 would be between 0% and 4%, and would be offset by a 5% currency devaluation. Nordson further projected that its earnings-per-share ("EPS") in the first quarter of 2016 would be between $0.47 and $0.57.

39. At or around the time of these projections, at least one stock analyst following Nordson stock, Barrington Research Associates, Inc., reported that it would be "more conservative" in its EPS projections for Nordson for fiscal 2016. The consensus among analysts was that Nordson's EPS for the first quarter of 2016 would be $0.55 per share.

40. Around the time of these public projections, Defendant was receiving MNPI towards the end of first quarter in 2016, including the biweekly revenue analysis and weekly backlog reports, showing that sales and revenues within Core Adhesives, Nordson's largest business division, were exceeding the company's internal projections.

41. For example, in January 2016, Defendant received a weekly backlog report showing that Core Adhesives' orders and shipments were both up significantly. Specifically, the report, which reflected orders and shipments over the first 12 weeks of the quarter, showed that shipments were up 13% and that orders were up 7%.

42. On January 21, 2016, Defendant received a revenue analysis showing that Core Adhesives was exceeding Nordson's internal projections on revenue. Specifically, the revenue analysis, which covered the same 12 weeks as the backlog report, showed that Core Adhesives had already exceeded its forecasts for the first quarter of 2016 by 2% ($3 million), and there were still 10

9

days left in the quarter.

### C. Defendant Traded on the Basis of MNPI in the First Quarter of 2016

43. On January 22, 2016, while knowingly in possession of the MNPI showing that Core Adhesives' revenues, orders and shipments were up significantly, Defendant contacted his securities broker and inquired about securing Nordson call options.

44. As of this time, Defendant had never traded options in any securities.

45. Defendant's broker warned him, in substance, that trading Nordson options was very difficult and risky because they were thinly traded, had a large margin, and thus required at least a 5% increase in stock price to be profitable.

46. Defendant ignored his broker's warnings, telling his broker he wanted to move forward with securing Nordson call options in advance of its earnings announcement for the first quarter of 2016.

47. Defendant told his broker that he thought analysts' expectations for Nordson were too conservative and he wanted to purchase the options in advance of the company announcing its earnings because Defendant felt analysts were underestimating the company's earnings, or words to that effect.

48. Nordson was scheduled to announce its first quarter earnings on February 26, 2016.

49. Although he was unable to obtain the options before Nordson's earnings announcement, Defendant successfully purchased Nordson stock while still knowingly in possession of the MNPI showing Core Adhesives' revenues, orders and shipments were up significantly.

50. On February 8, 2016, Defendant purchased $20,000 worth of Nordson stock through his E*Trade brokerage account.

51. This was the first trade Defendant made in this brokerage account in over three years.

52. On February 19, 2016, Defendant purchased an additional $1.1 million worth of Nordson stock using all of the funds in his Nordson Employees' Savings Trust Plan, a 401(k) account.

53. On February 22, 2016, Nordson released its earnings to the public, announcing that it had hit the high end of its sales guidance with 4% growth in the first quarter of 2016, offset by a 5% currency devaluation, and that EPS for the quarter was $0.72, which was 26% above its high-end guidance. ADS made up 54% of Nordson's sales in the first quarter of 2016.

54. On February 23, 2016, the day after Nordson announced its first quarter earnings, its stock price rose 6%, and Defendant quickly sold all of the Nordson shares he had bought through his E*Trade account, netting a profit of $4500.

55. Over the next month, Nordson's stock price continued to rise. On March 17, 2016, after it added another 9% in value, Defendant sold all of the remaining shares he had purchased in Nordson through his 401(k) account, netting a profit of $219,000 in less than a month.

56. At the time of his February and March 2016 trades, Defendant knew, or was reckless in not knowing, that the information he possessed concerning Nordson's first quarter financial results was material nonpublic information.

57. Defendant also knew, or was reckless in not knowing, that he owed Nordson's shareholders a duty of trust or confidence to keep the material, nonpublic information he possessed concerning Nordson's first quarter 2016 financial results confidential, and to not trade on it.

**D.     Defendant Learned MNPI in the Second Quarter of 2016**

58. After having a strong first quarter, Nordson raised the projections in its public guidance for the second quarter of 2016, setting projected sales growth at between 2% and 6%, and projected EPS at between $0.85 and $0.95.

59. At least two stock analysts following Nordson, Baird Equity Research and Wells

Fargo Securities, projected that Nordson would not exceed its own guidance.

60.  Around the time of these projections, Defendant was receiving MNPI towards the end of the second quarter in 2016, including the biweekly revenue analysis and weekly backlog reports, showing that sales and revenues for Core Adhesives were exceeding the company's internal projections.

61.  For example, in late April 2016, Defendant received a weekly backlog report showing that Core Adhesives orders and shipments were both up significantly.  Specifically, the report, showed that orders were up 12% over the same period in the year prior and that shipments were up 27% over the prior year.

62.  On April 27, 2016, Defendant received a revenue analysis showing that Core Adhesives was exceeding its internal projections on revenue by 3% ($5.1 million) with 5 days left in the quarter.

        **E.**     **Defendant Traded on the Basis of MNPI in the Second Quarter of 2016**

63.  On May 10, 2016, while knowingly in possession of the MNPI showing that Core Adhesives' revenues, orders and shipments were up, Defendant contacted his securities broker and again inquired about securing Nordson options contracts in advance of its second quarter earnings, which were scheduled to be announced on May 23, 2016.

64.  This time, on May 19, 2016, Defendant's broker was able to secure the Nordson options contracts Defendant inquired about and, despite his broker's previous warnings about Nordson options being a risky investment, Defendant authorized his broker to acquire $41,000 worth of Nordson options contracts.

65.  The same day Defendant gave his broker this authorization, he also purchased $1.3 million worth of Nordson stock while still knowingly in possession of MNPI, once again using all of the funds in his Nordson Employees' Savings Trust Plan, a 401(k) account.

66. On May 23, 2016, Nordson released its earnings to the public, announcing that it had EPS for the quarter of $1.23, surpassing analysts' expectations and Nordson's high-end guidance by 23%. ADS made up 50% of Nordson's sales in the second quarter of 2016.

67. On May 24, 2016, the day after Nordson announced its second quarter earnings, its stock price rose 14% to $87 per share in a single day. The following day, on May 25, 2016, Defendant sold all of the Nordson options contracts he had authorized his broker to purchase on May 19, 2016, netting a profit of $95,421.

68. A few days later, on May 27, 2016, Defendant sold all of the shares he had purchased in Nordson using his 401(k) account, netting a profit of $228,954 in less than 10 days.

69. At the time of his May 2016 trades, Defendant knew, or was reckless in not knowing, that the information he possessed concerning Nordson's second quarter financial results was material nonpublic information.

70. Defendant also knew, or was reckless in not knowing, that he owed Nordson's shareholders a duty of trust or confidence to keep the material, nonpublic information he possessed concerning Nordson's second quarter 2016 financial results confidential, and to not trade on it.

**F. Defendant Learned MNPI in the Third Quarter of 2016**

71. After its strong first and second quarters, Nordson again raised its projection for EPS in the third quarter of 2016, projecting it would be between $1.25 and $1.37. Nordson's projections for sales growth in the third quarter of 2016 were that it would have between 1% and 5% growth.

72. At or around the time of these projections, the consensus projection among Nordson analysts was for third quarter EPS to be $1.33.

73. But the MNPI Defendant was receiving towards the end of third quarter in 2016, including the biweekly revenue analysis and weekly backlog reports, showed that sales and revenues

for Core Adhesives were still exceeding the company's internal projections.

74.     For example, on July 22, 2016, Defendant received a revenue analysis showing that Core Adhesives was exceeding its internal projections on revenue by 8% ($12 million) with 10 days left in the quarter.

75.     Later in July 2016, Defendant received a weekly backlog report showing that shipments for Core Adhesives were up 14% over the year prior and that orders were up 6% over the same 12-week period the prior year.

### G.     Defendant Traded on the Basis of MNPI in the Third Quarter of 2016

76.     On August 12, 2016, while knowingly in possession of MNPI showing Core Adhesives' revenues were exceeding the company's projections, Defendant contacted his broker and again inquired about securing Nordson options contracts in advance of its third quarter earnings, which were scheduled to be announced on August 22, 2016.

77.     On August 18, 2016, Defendant's broker secured the Nordson options contracts Defendant had inquired about on August 12, 2016, and Defendant authorized his broker to acquire $100,033 worth.

78.     The same day, while still knowingly in possession of MNPI, Defendant purchased $1.5 million worth of Nordson stock, using all of the funds in his Nordson Employees' Savings Trust Plan, a 401(k) account.

79.     On August 22, 2016, Nordson released its earnings to the public, announcing that it had exceeded expectations for the quarter with sales growth of 6% and EPS of $1.46, which was 9% higher than analysts' expectations.

80.     On August 23, 2016, the day after Nordson announced its third quarter earnings, its stock price rose 10% in a single day.  Two days later, on August 24, 2016, Defendant sold all of the Nordson options contracts he had authorized his broker to purchase on August 18, 2016, netting a

profit of $190,819.

81. The same day, Defendant sold all of the remaining shares he had purchased in Nordson using his 401(k) account, netting a profit of $147,827 in a week.

82. At the time of his August 2016 trades, Defendant knew, or was reckless in not knowing, that the information he possessed concerning Nordson's third quarter financial results was material nonpublic information.

83. Defendant also knew, or was reckless in not knowing, that he owed Nordson's shareholders a duty of trust or confidence to keep the material, nonpublic information he possessed concerning Nordson's third quarter 2016 financial results confidential, and to not trade on it.

84. In total, between January 2016 and August 2016, Defendant invested over $4 million in Nordson while knowingly in possession of MNPI and netted over $850,000 in profits when he later sold those investments. A table summarizing his investments and profits is set forth below:

| Source / Type | Investment | Buy Date | Earnings Date | Sale Date | Proceeds | Profit |
|---|---|---|---|---|---|---|
| E*Trade | $19,977 | 2/8/2016 | 2/23/2016 | 2/26/2016 | $24,508 | $4,531.17 |
| 401(k) | $1,104,971 | 2/19/2016 | 2/23/2016 | 3/17/2016 | $1,328,255 | $219,282.57 |
| 401(k) | $1,333,897 | 5/19/2016 | 5/23/2016 | 5/27/2016 | $1,567,178 | $228,954.60 |
| Options | $41,087 | 5/20/2016 | 5/23/2016 | 5/25/2016 | $136,509 | $95,421.96 |
| Options | $100,033 | 8/18/2016 | 8/22/2016 | 8/24/2016 | $290,852 | $190,819.79 |
| 401(k) | $1,575,438 | 8/18/2016 | 8/22/2016 | 8/24/2016 | $1,727,658 | $147,827.15 |

### H. Defendant Lied to the Commission Regarding His Trading in Nordson Securities, and Tampered with Evidence

85. On June 5, 2017, the Commission staff contacted Defendant in Taiwan over the telephone and questioned him about his trading in Nordson securities. When asked about the reasons for his trading in Nordson options, Defendant made false and misleading statements to the staff, claiming that he was just "trying out" options trading and had selected Nordson only because it was a stable company.

86. Defendant's statements to the Commission staff were false and misleading because he concealed the fact that he wanted to purchase Nordson securities because he believed that analysts' projections were too conservative and that earnings were going to be better than market expectations, the reasons he had contemporaneously told his broker.

87. To the contrary, Defendant claimed to the Commission staff that he had no specific knowledge regarding Nordson's expected earnings or if Nordson's stock would be likely to rise.

88. Defendant also distorted the timing and extent of his trades in Nordson securities, when questioned by the Commission staff. According to Defendant, his trades were not intended to coincide with Nordson's earnings announcements and instead his options trading was done simply on impulse.

89. According to his broker, however, Defendant's whole strategy was to buy Nordson securities before its earnings announcements and then sell them after those announcements.

90. In other words, according to his broker, Defendant said he executed the trades because he believed the earnings were going to be better than what was expected in the market.

91. When the Commission staff questioned Defendant about the extent of his trading in Nordson securities, he completely omitted all of the 2016 trades he executed using his Nordson Employees' Savings Trust Plan, a 401(k) account.

92. Defendant led the Commission staff to believe that his trading in Nordson stock in

2016, as opposed to his options trading, was "not significant" and limited to only around $20,000.

93. Defendant's statements regarding the extent of his trading were intentionally misleading because Defendant failed to disclose to the Commission staff that he had on three separate occasions in 2016 invested over $1 million in Nordson stock through his 401(k) account.

94. After questioning Defendant about his trading in Nordson securities, the Commission staff advised Defendant that he would be receiving an investigative subpoena from the Commission and should preserve all documents related to his trading.

95. The following day, Defendant and his employer, Nordson, received subpoenas from the Commission seeking, in substance, all documents related to Defendant's trading in Nordson securities.

96. On June 9, 2016, Nordson issued a legal hold notice to Defendant. Shortly thereafter, the assistant general counsel for Nordson advised Defendant by phone that Nordson personnel would be imaging his laptop computer, and not to delete anything on his computer or in his possession.

97. According to a forensic image taken of his Nordson laptop computer, Defendant countermanded the admonishments he received from the Commission staff and the assistant general counsel for Nordson by attempting to delete a large number of files from his computer on June 10 and 12, 2016.

98. Defendant attempted to delete files after he had received the Commission's subpoena, after he had received the legal hold notice, and after he had been advised by the Commission staff and the general counsel to preserve the documents on his computer.

99. Defendant also deleted a large number of files from his laptop computer in February 2017, after the brokerage firm where his broker worked, Brokerage Firm # 1, questioned Defendant about his trading.

100.    On February 22, 2017, Brokerage Firm # 1 contacted Defendant over the telephone and by email and requested that he provide a letter from Nordson stating that he was not subject to any trading restrictions in Nordson's stock, and that he did not have access to inside information at the time he placed the options trades through his broker in May 2016 and August 2016.

101.    The files Defendant deleted files shortly after being contacted by Brokerage Firm # 1 in February 2017 are generally unrecoverable, but the file titles indicate the deletions included financial reporting for Core Adhesives like those referenced above.

## FIRST CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
(Defendant)

102.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 101.

103.    By engaging in the conduct described above, Defendant Davis, directly or indirectly, bought and sold securities in Nordson between January 2016 and August 2016, while knowingly in possession of material, nonpublic information of Nordson that the Core Adhesives division was outperforming internal forecasts and its orders and shipments were up sharply from the same time the year before, which Defendant Davis knew, or was reckless in not knowing, was in breach of Nordson's Code of Ethics and his duty of trust and confidence to Nordson's shareholders as vice president of its Asia Pacific Group.

104.    Defendant, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or

(iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

105. By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Defendant Bradley C. Davis and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Exchange Act Sections 10(b), and Rules 10b-5 thereunder [17 C.F.R. §§ 240.10b-5(b)].

### II.

Ordering Defendant to disgorge all ill-gotten gains they received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations;

### III.

Ordering Defendant to pay civil monetary penalties under Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and

**IV.**

Granting any other and further relief this Court may deem just and proper.

Dated: Los Angeles, California

February 20, 2020

/s/ Amy Jane Longo
AMY JANE LONGO
DOUGLAS M. MILLER*
ALEC JOHNSON**
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
444 S. Flower Street, Suite 900
Los Angeles, California 90071
323-965-3998 (Miller)
millerdou@sec.gov

*Not admitted in SDNY
**Not admitted in New York